[No. B190481. Second Dist., Div. Seven. Oct. 24, 2007.]

BI-RITE MEAT & PROVISIONS CO., Plaintiff and Appellant, v.
CITY OF HAWAIIAN GARDENS REDEVELOPMENT AGENCY,
Defendant and Respondent.

COUNSEL

Anthony P. Parille and Tina R. Sibbit for Plaintiff and Appellant.

Linda L. Daube for Defendant and Respondent.

OPINION

**WOODS, J.**—Appellant Bi-Rite Meat & Provisions Co. (Bi-Rite) appeals from the trial court's order denying its petition for writ of mandate. In the petition, Bi-Rite sought an order directing respondent City of Hawaiian Gardens Redevelopment Agency (Agency) to pay relocation benefits to Bi-Rite. In

denying the petition, the trial court held that Agency's board's decision that (1) Bi-Rite did not timely submit a claim and (2) Bi-Rite failed to provide evidence to support good cause to be relieved from the statute of limitations did not abuse the board's discretion, was in accordance with the law and was not arbitrary, capricious or without evidentiary support. We agree. The evidence shows that Bi-Rite untimely filed a claim for relocation benefits and that Agency's board did not err in finding no good cause to extend the statute of limitations. Accordingly, we affirm the trial court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Inverse Condemnation Proceedings

Bi-Rite operated as a specialty meat, fish and poultry market in the City of Hawaiian Gardens. Bi-Rite was a subtenant of a supermarket, Plowboys Market.[1] In August 1993, under threat of eminent domain, Agency acquired the property that Bi-Rite and Plowboys leased. In May 1994, Agency conveyed title of the property to a developer. In October 1995, Plowboys closed the supermarket and Bi-Rite left behind equipment, furniture, fixtures and an inventory of meat.

Agency filed no eminent domain action against Bi-Rite. Instead, on June 23, 1995, Bi-Rite filed an inverse condemnation action against Agency to receive compensation as a result of displacement.[2] On October 1, 1996, a jury verdict awarded Bi-Rite $800,000 in the inverse condemnation case for loss of goodwill. In addition, a $93,000 judgment was entered into by way of stipulation to compensate Bi-Rite for the immovable property and improvements. The judgment was entered on November 8, 1996, and became final on July 8, 1998. Bi-Rite demanded payment, but Agency could not satisfy the judgment. Bi-Rite sought a writ of mandate to compel payment of the judgment and on July 6, 2000, Agency satisfied the judgment in full.

In November 2002, Bi-Rite and Plowboys Market moved to a site in Fountain Valley and the business was reopened in May 2003.

### B. Relocation Benefits

Starting in October 2000, Bi-Rite's agents sent a series of letters regarding relocation benefits to Agency and the City of Hawaiian Gardens. The following is a summary of these letters.

---

[1] Plowboys Market's lease expired February 29, 2000.

[2] Among other things, Bi-Rite's inverse condemnation complaint stated that (1) Agency advised Bi-Rite that Bi-Rite would receive relocation benefits and (2) Agency provided Bi-Rite with an "Informational Statement For Businesses To Be Displaced." A copy of this informational statement is not found in the record.

### 1. *October 18, 2000*

In a letter dated October 18, 2000, Bi-Rite's relocation agent wrote a letter to the agency, which said: "I last wrote to you on August 28, 2000[3] . . . . We have requested that you compensate Bi-Rite Meat and Provisions Co., for their anticipated relocation costs, so that they may move and continue in business. However, after five years, this has not happened.

"I have also requested that you schedule a meeting with the agency's appeals board and you have failed to do that also.

"I HEARBY REQUEST THAT AN APPEALS BOARD HEARING BE SET ON OR BEFORE NOVEMBER 10, 2000.

"If a hearing is not scheduled on or before November 10, 2000, I will turn this matter over to our attorney for legal action. . . ."

### 2. *March 16, 2002*

Another relocation agent wrote to Agency to inform it that he was Bi-Rite's new relocation consultant. He said, "Pursuant to the agreement made with you regarding the relocation . . . we hereby request relocation assistance."

### 3. *April 8, 2004*

Bi-Rite's counsel wrote to the Clerk of the City of Hawaiian Gardens to demand that Agency provide "relocation benefits, including compensation for . . . equipment stored by Hawaiian Gardens and never returned" to Bi-Rite and to verify that, among other things, a hearing regarding Bi-Rite's relocation benefits had not been held. If a hearing had been held, Bi-Rite's counsel asked the clerk for documentation of the hearing.

### 4. *June 24, 2004*

Bi-Rite's counsel wrote to Agency's counsel concerning Bi-Rite's relocation expenses. In this letter, Bi-Rite's counsel mentioned that previous discussions with Agency's counsel had taken place regarding relocation benefits and that since those discussions, Bi-Rite's counsel had been unsuccessful in trying to contact Agency's counsel. Bi-Rite's counsel also stated that relocation benefits were not litigated in the inverse condemnation proceeding and that Agency had not held a hearing regarding Bi-Rite's relocation benefits.

---

[3] The August 28, 2000, letter appears nowhere in the record before this court.

### 5. *September 3, 2004*

On September 3, 2004, Bi-Rite's counsel demanded $675,102.07 in relocation benefits and attached three exhibits to the letter. The first exhibit was an itemized list of all the equipment that Bi-Rite purchased to reestablish its business. The second and third exhibits detailed the expenses incurred in establishing business at the new site, such as construction costs, permits and licenses, utility fees, labor, stationery and advertising, and marketing.

### 6. *October 26, 2004*

In response to Bi-Rite's counsel's September 3, 2004, letter, Agency's counsel stated that there was no record of the relocation claim being filed within the 18-month statutory period established by California Code of Regulations, title 25, section 6088.

### 7. *October 29, 2004*

Bi-Rite's counsel verified receipt of the October 26, 2004, letter and stated that Agency "had been apprised and was aware of the efforts being made by [Bi-Rite] to relocate and that a relocation site was not found until 2002." Bi-Rite's counsel also reduced the demand for relocation benefits from $675,102.07 to $375,020.42, after deducting the amounts for which Bi-Rite received compensation as part of the inverse condemnation case. Bi-Rite's counsel concluded this letter by saying, "If I do not hear from you by November 10, 2004 regarding the scheduling of the Relocation Appeals Board, I will have no other remedy than to file a Petition for a Writ of Mandate."

## C. *First Writ of Mandate*

On December 6, 2004, Bi-Rite filed a notice of hearing for petition for writ of mandate. On May 2, 2005, the court granted the writ and remanded the case for an administrative hearing before Agency's board.

## D. *Administrative Hearing*

On August 9, 2005, Agency held a hearing to determine if Bi-Rite timely filed a claim for relocation benefits and if Bi-Rite was eligible to receive relocation benefits. Before the hearing, Agency's staff prepared a report, which summarized the communications between Bi-Rite's counsel and Agency's counsel and concluded that Bi-Rite untimely filed its claim because it failed to submit its claim within either 18 months of the final judgment, which occurred on July 8, 1998, or within 18 months of closing business in October 1995.

The Agency staff report recommended that Agency adopt resolution No. 2005-022, which stated (1) Bi-Rite untimely filed the claim, (2) Agency already fully compensated Bi-Rite for the loss of its business, (2) Bi-Rite failed to provide any evidence to support good cause to waive the statute of limitations and (4) Bi-Rite opened a new business—as opposed to a relocated business—in 2003 and was not entitled to relocation benefits under the act. At the hearing, the parties presented documents and submitted evidence, and Bi-Rite's counsel argued. Agency's board adopted resolution No. 2005-022.

### E. *Second Writ of Mandate*

Bi-Rite filed a second petition for writ of mandate requesting the court to direct Agency to provide Bi-Rite with relocation costs of $382,803.82. On February 2, 2006, the court denied the petition, concluding that Agency's board's decisions that (1) Bi-Rite failed to submit a timely claim for relocation benefits and that (2) Bi-Rite failed to provide evidence to show good cause to be relieved from the statute of limitation were supported by evidence and not an abuse of discretion.[4]

Bi-Rite appeals from the trial court's denial of its petition.

## DISCUSSION

On appeal, Bi-Rite claims the trial court should have granted its petition for a writ of mandate and compelled Agency to pay Bi-Rite's relocation benefits. Specifically, Bi-Rite argues that it filed a claim for relocation assistance within the limitations period and, in the alternative, even if Bi-Rite did not file within the limitations period, good cause existed to extend the limitations period.

### I. *STANDARD OF REVIEW*

In reviewing the trial court's ruling on the writ of mandate, this court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial evidence. (*Morris v. Harper* (2001) 94 Cal.App.4th 52, 58–59 [114 Cal.Rptr.2d 62].) This court, however, may make its own determination when an issue involves resolution of questions of law where the decisive facts are undisputed. (*Kong v. City of Hawaiian Gardens Redevelopment Agency* (2002) 101 Cal.App.4th 1317, 1325 [125 Cal.Rptr.2d 1].)

---

[4] This court does not have the benefit of a transcript from this trial court proceeding. Although requested by Bi-Rite's counsel, the court reporter was unable to locate any recorded proceedings from February 2, 2006.

## II. *TIMELINESS OF CLAIM*

### A. *Background on the Relocation Assistance Act*

█ The primary purpose of the California Relocation Assistance Act (act) is to ensure that displaced persons shall not suffer disproportionate injuries as a result of programs and projects designed for the benefit of the public as a whole and to minimize the hardship of displacement on these persons. (Gov. Code, § 7260.5.)[5] Pursuant to the act, public entities must adopt rules and regulations to implement payments and administer relocation assistance. (Gov. Code, § 7267.8; see Cal. Code Regs., tit. 25, § 6000 et seq.)

█ To obtain relocation benefits, a displaced party must file a claim with the public entity within either 18 months of the date on which the claimant received final payment for the property or within 18 months from the date on which the claimant moved, whichever is later. The displacing entity may extend this period upon a proper showing of good cause. (Cal. Code Regs., tit. 25, § 6088.) Whether Bi-Rite complied with these requirements will depend on whether and (when) Bi-Rite submitted an appropriate "claim."

### B. *What is a "claim" for relocation benefits?*

The regulations promulgated by the Department of Housing and Community Development set forth specific categories of losses that may be claimed, as well as information that must be provided by the claimant. (Cal. Code Regs., tit. 25, §§ 6090, 6092.)[6] Pursuant to those regulations, a claim must include billings (Cal. Code Regs., tit. 25, § 6090, subd. (g)(1)), and, in the case of claims over $1,000, competitive bids. (Cal. Code Regs., tit. 25, § 6090, subd. (g)(2).) With respect to personal property, written evidence of loss is also required. (Cal. Code Regs., tit. 25, § 6092, subd. (c).)

These regulations assure all parties that the public entity has the information that will enable it to determine that a claim is properly limited to covered losses, and that the amounts are reasonable; they also provide notice to the claimant of what showing must be made.

---

[5] All statutory references are to the Government Code, unless otherwise indicated.

[6] California Code of Regulations, title 25, section 6090 provides, in pertinent part, as follows:

"(a) General. A public entity shall make a payment to a displaced person . . . for actual reasonable expenses specified below and subject to the limitations set forth in subsection (c) of

In general, claim requirements should not be applied rigidly or to "snare the unwary." (See *Gay-Straight Alliance v. Visalia Unified School* (E.D.Cal. 2001) 262 F.Supp.2d 1088, 1106.) Rather, to gauge the sufficiency

---

this section for moving himself, his family, business, farm operation or other personal property. In all cases the amount of a payment shall not exceed the reasonable cost of accomplishing the activity in connection with which a claim has been filed.

"The moving and related expenses for which claims may be filed shall include:

"(1) Transportation of persons and property . . . ;

"(2) Packing, crating, unpacking and uncrating personal property;

"(3) Such storage of personal property . . . ;

"(4) Insurance of personal property while in storage or transit; and

"(5) The reasonable replacement value of property lost, stolen or damaged . . . in the process of moving, where insurance covering such loss, theft or damage is not reasonably available.

"(6) The cost of disconnecting, dismantling, removing, reassembling, reconnecting and reinstalling machinery, equipment or other personal property . . . .

"(b) Actual Reasonable Moving Expenses-Displaced Business Concerns and Farm Operations.

"In addition to those compensable expenses set forth in subsection (a) of this section, a displaced business concern or farm operation may file a claim for the following moving and related expenses:

"(1) The cost, directly related to displacement of modifying the machinery, equipment, or other personal property to adapt it to the replacement location or to utilities available at the replacement location or modifying the power supply. [¶] . . . [¶]

"(3) The cost of any license, permit or certification required by a displaced business concern to the extent such cost is necessary to the reestablishment of its operation at a new location.

"(4) The reasonable cost of any professional services (including but not limited to, architects', attorneys' or engineers' fees, or consultants' charges) necessary for planning the move of personal property, moving the personal property, or installation of relocated personal property at the replacement site. [¶] . . . [¶]

"(e) Self-moves. Without documentation of moving expenses actually incurred, a displaced person electing to self-move may submit a claim for his moving expenses to the public entity in an amount not to exceed an acceptable low bid or an amount acceptable to the displacing entity. [¶] . . . [¶]

"(g) Documentation in Support of a Claim.

"(1) General. Except in the case of a displaced person conducting a self-move as provided in subsection (e) above, a claim for a payment under this section shall be supported by a bill or other evidence of expenses incurred. By prearrangement between the public entity, the site occupant, and the mover, evidenced in writing, the claimant or the mover may present an unpaid moving bill to the public entity, and the public entity may pay the mover directly.

"(2) Business and Farm Operations. Each claim in excess of $1,000 for the costs incurred by a displaced person for moving his business or farm operation shall be supported by competitive bids in such number as are practical. If the public entity determines that compliance with the bid requirement is impractical or if estimates in an amount of less than $1,000 are obtained, a claim may be supported by estimates in lieu of bids. [¶] . . . [¶]

"(i)(1) Reestablishment Expenses. In addition to moving expense payments, a farm, nonprofit organization or small business of not more than 500 employees, shall be entitled to actual and reasonable reestablishment expenses, not to exceed $10,000.00. . . ."

California Code of Regulations, title 25, section 6092 provides, in pertinent part, as follows:

"(a) General. A public entity shall make a payment to a displaced person who satisfies the eligibility requirements of section 6090 and this section, for actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation, in an

of a particular claim, the court looks at (1) whether there is some compliance with all of the statutory requirements; and (2) if so, whether such compliance is sufficient to constitute substantial compliance. (*City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 456–457 [115 Cal.Rptr. 797, 525 P.2d 701].)

### C. *When did Bi-Rite file a "claim" with Agency?*

The first step is to determine if and when Bi-Rite filed a claim for relocation assistance. We look to the written communications sent from Bi-Rite's agents to Agency to see which, if any, substantially complied with the claim requirements described above. Since the underlying facts are undisputed, we review this question de novo.

#### 1. *Original Inverse Condemnation Suit*

Although Bi-Rite's complaint in the inverse condemnation suit mentions relocation benefits, the complaint cannot be considered a claim for relocation benefits because it makes no request for benefits and includes no general description of the amount of indebtedness or obligation due for relocation benefits.[7] Rather, the complaint states that Agency provided Bi-Rite a copy of the "Informational Statement For Businesses To Be Displaced" and informed Bi-Rite that Bi-Rite would receive relocation benefits.

#### 2. *Letters from October 18, 2000, to September 3, 2004*

None of the communications sent by Bi-Rite's agents between October 18, 2000, and June 24, 2004, substantially complied with the claim requirements. The October 2000 letter provided no description of the indebtedness, obligation, injury, damage or loss incurred by Bi-Rite, nor any supporting documentation.

Moreover, the tone of the October 2000 letter and the fact that it referenced an earlier August 2000 letter imply that the relocation agent who wrote the letter believed that a claim for *anticipated* relocation expenses had *already*

---

amount determined by the public entity to be in accordance with the provisions of this section. [¶] . . . [¶]

"(c) Documentation to Support Claim. A claim for payment hereunder shall be supported by written evidence of loss which may include appraisals, certified prices, bills of sale, receipts, cancelled checks, copies of advertisements, offers to sell, auction records, and other records appropriate to support the claim or the public entity may agree as to the value of the property left in place."

[7] This is consistent with the general rule that a party may not assert, prove or recover relocation benefits in an eminent domain trial. (*Orange County Flood Control Dist. v. Sunny Crest Dairy, Inc.* (1978) 77 Cal.App.3d 742, 766–767 [143 Cal.Rptr. 803].)

been filed.[8] The letter's request for a hearing, presumably on the already-filed claim, reinforces the viewpoint that the writer thought Bi-Rite had already filed a claim with Agency.

In the March 16, 2002, letter, Bi-Rite's new relocation agent requested relocation benefits for Bi-Rite. Although this letter specifically requested relocation assistance, it does not substantially comply with the claims procedure because it contained no general description of the indebtedness, obligation, injury, damage or loss incurred by Bi-Rite.

In the April 8, 2004, letter to the Clerk of the City of Hawaiian Gardens, Bi-Rite's counsel asks that Agency "provide proper relocation benefits, including compensation for Plowboy's equipment stored by Hawaiian Gardens and never returned" to Bi-Rite. Bi-Rite's counsel also sought to discover whether a hearing was held, pursuant to the relocation agent's request, regarding Bi-Rite's relocation benefits. Bi-Rite's counsel then states that Bi-Rite will "pursue its remedies . . . to recover what it is entitled to receive as a result of the forced relocation . . . ."

This letter provided some description of what Bi-Rite sought to recover, but this letter lacks enough information for Agency to thoroughly investigate the claim, negotiate a settlement or prepare a defense.

Bi-Rite's counsel's June 24, 2004, letter to Agency's counsel serves to memorialize Bi-Rite's counsel's attempts to contact Agency's counsel and is not a claim for relocation assistance.

The September 3, 2004, letter is the first letter in the record which, in our view, substantially complies with the claim procedure. In that letter Bi-Rite's counsel writes to "set forth and explain" his $675,102.07 demand for relocation benefits. This letter provides contact information for Bi-Rite's agents, explains the circumstances that gave rise to the claim and provides a detailed description of the obligation Bi-Rite sought Agency to fulfill.

D.  *Application of 18-Month Timeframe to File a Claim for Relocation Benefits*

Our next step is to determine if Bi-Rite's claim from September 3, 2004, was filed within the timeframe called for in the regulations. All claims filed with a public entity for relocation payments must be submitted within 18

---

[8] Although the October 2000 letter implies the August 2000 letter was a "claim" for relocation benefits, the contents of the August 2000 letter, and whether it would meet the regulatory requirements, cannot be determined by this court because the letter is not before us.

months of the date on which the claimant receives final payment for the property *or* the date on which the claimant moves, whichever is later.[9] (Cal. Code Regs., tit. 25, § 6088.) As we shall explain, under either option identified in regulation section 6088, Bi-Rite's claim is untimely.

### 1. *Option #1: Within 18 Months of the Date of Final Payment*

It is undisputed that Agency satisfied the inverse condemnation judgment in full on July 6, 2000. Thus, under this option, Bi-Rite had until January 6, 2002, to timely file a claim with Agency. Under option 1, Bi-Rite's September 3, 2004, claim is not timely.

### 2. *Option #2: Within 18 Months of the Date of Claimant's "Move"*

Bi-Rite moved out of the Hawaiian Gardens location on or about October 1995, found a Fountain Valley location on or about November 2002 and reopened the business in May 2003. Thus, whether Bi-Rite's claim is timely under option 2 depends on the meaning of the term "moves."

Bi-Rite contends that the term "moves" in California Code of Regulations, title 25, section 6088 means "*moves in.*" The trial court rejected this construction. According to Bi-Rite, its claim would have been timely if it were filed within 18 months of May 2003, when Bi-Rite finally "*moved into*" and "set up business" in Fountain Valley. This interpretation of the regulation would make the deadline to file a claim January 2005, 18 months after May 2003. Bi-Rite argues that this is the proper construction because "reason" dictates that a displaced business that has yet to find a relocation site cannot submit a claim for benefits if it does not have any estimation of what the costs will be.

Conversely, Agency contends that "moves" means "*moves from,*" and that a claim would have been timely filed if it were filed within 18 months of October 1995, when Bi-Rite *moved from* the Hawaiian Gardens location. Using this calculation, the deadline to file a claim was April 1997.

We look to the regulations to see if they define the term "moves," as it is used in California Code of Regulations, title 25, section 6088. The regulation's purpose is to set forth the types of, and specific eligibility criteria for, relocation payments for *displaced* persons. (Cal. Code Regs., tit. 25, § 6080.) A displaced person, in turn, is any person who *moves from* real property as a result of displacing activity undertaken by a public entity. (Cal. Code Regs., tit. 25, § 6008, subd. (f).)

---

[9] The staff report, on which Agency relied in the August 9, 2005, hearing, incorrectly calculated the deadline for filing a claim to be the later of 18 months from the *final judgment* in the inverse condemnation action or 18 months from appellant's *close of business.*

Since regulation section 6088 only applies to *displaced* persons, and displaced persons are those who *move from* real property, it follows that "moves" in regulation section 6088 means "*moves from.*"

Moreover, the regulations provide that a displaced business with a claim in excess of $1,000 need not wait until it is relocated to file a claim for relocation assistance. Instead, a displaced business which has yet to relocate can submit a claim supported by competitive bids or estimates. (Cal. Code Regs., tit. 25, § 6090, subd. (g)(2).)[10] Bi-Rite's relocation agent knew this because, in the October 2000 letter, he requested compensation for *anticipated* relocation benefits. Regulation section 6090, subdivision (g)(2) and the relocation agent's request for *anticipated* relocation costs directly undercut Bi-Rite's argument that a displaced, yet-to-be-relocated business cannot submit a claim for relocation benefits.

Furthermore, cases have consistently held that the operative date for eligibility under the act is the moving date of the *displaced* person (*Kong v. City of Hawaiian Gardens Redevelopment Agency, supra,* 101 Cal.App.4th 1317 at p. 1326), or one who *moves from* real property. In *Superior Strut Hanger Co. v. Port of Oakland* (1977) 72 Cal.App.3d 987, 1003 [140 Cal.Rptr. 515],[11] the court reiterated that claims were to be made within 18 months of the date on which the displaced person *moves from* the real property acquired by the public entity.

We also agree with the trial court that the Legislature did not "intend to make the expiration for the 18 month period depend solely upon the claimant's choice as to when it would reopen its business at a new location." As the trial court properly concluded, the term "moves" in California Code of Regulations, title 25, section 6088 means "*moves from.*"

In sum, the deadline to file a relocation assistance claim was 18 months after the later of the date on which the claimant received final payment for the property, July 6, 2000, *or* the date on which the claimant moved from the property, October 1995. Therefore, the latest date when the Bi-Rite could have filed a claim was 18 months after July 6, 2000, which was January 6, 2002. Thus, Bi-Rite's September 2004 claim is untimely.

---

[10] Each claim in excess of $1,000 for the costs incurred by a displaced person for moving his business or farm operation shall be supported by competitive bids in such number as are practical. If the public entity determines that compliance with the bid requirement is impractical or if estimates in an amount of less than $1,000 are obtained, a claim may be supported by estimates in lieu of bids. (Cal. Code Regs., tit. 25, § 6090, subd. (g)(2).)

[11] Superseded by statute on other grounds, *Melamed v. City of Long Beach* (1993) 15 Cal.App.4th 70 [18 Cal.Rptr.2d 729].

## III.  *GOOD CAUSE TO EXTEND THE LIMITATIONS PERIOD*

Although all claims filed with a public entity for relocation payments must be submitted within 18 months of the date on which the claimant receives final payment for the property *or* the date on which the claimant moves, the displacing entity may extend this period upon a proper showing of good cause. (Cal. Code Regs., tit. 25, § 6088.)

Because the trial court's determination on good cause turns on the court's assessment of facts and evidence before it, we are confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial evidence. (*Morris v. Harper, supra*, 94 Cal.App.4th at pp. 58–59.) We hold that they are.

The trial court looked at the evidence presented at Agency's hearing. There, no one testified, but both Bi-Rite and Agency presented documents and Bi-Rite's counsel argued. Bi-Rite, however, presented *no* evidence to explain why it took it so long to file the claim for relocation benefits. Although the trial court recognized that it may have been necessary for Plowboys Market to find a new location before Bi-Rite could relocate, the court found no explanation as to why it took several years. Furthermore, Bi-Rite never requested an extension to the time limit.

The record shows that counsel represented Bi-Rite both during the complex inverse condemnation litigation and on this current matter. It is clear that Bi-Rite knew of its right to relocation benefits. In fact, Bi-Rite's inverse condemnation complaint discussed relocation benefits and admitted that Agency had supplied Bi-Rite with a document about the relocation benefits process. Bi-Rite even consulted with relocation specialists to assist with the relocation process, yet Bi-Rite provided no proof of *any* document being filed with Agency that substantially complied with the claim requirements to receive relocation assistance until September 2004, which is over eight years after moving from the Hawaiian Gardens location and over four years from when Agency satisfied the inverse condemnation judgment.

In view of the guidance provided for businesses to file a claim for anticipated relocation costs in California Code of Regulations, title 25, section 6090 and the time limitation to file a claim of California Code of Regulations, title 25, section 6088, we reject Bi-Rite's general systemic attack on the claims process. Moreover, even if we credit *all* the evidence *against* Agency, Agency was at most nonresponsive and dilatory. None of Agency's behavior,

however, explains away the fact that Bi-Rite did not timely file a claim for relocation assistance within the limitations period.[12]

## DISPOSITION

The judgment is affirmed. Respondent is entitled to its costs on appeal.

Perluss, P. J., and Zelon, J., concurred.

---

[12] Likewise, an equitable remedy is not available. Agency is correct in arguing that an equitable remedy is not intended to take the place of a legal remedy, but rather to provide recourse where no remedy at law is available. Here the Relocation Assistance Act and the California Code of Regulations provided specific legal remedies for parties in Bi-Rite's situation. (*Lass v. Eliassen* (1928) 94 Cal.App. 175, 179 [270 P. 745] [the rules of equity cannot intrude into matters that are plainly and fully covered by positive statute].)