[No. E031001. Fourth Dist., Div. Two. Apr. 30, 2003.]

ROBERT KOREY WOODBURY, a Minor, etc., et al., Plaintiffs and Respondents, v.
PATRICIA BROWN-DEMPSEY, as Superintendent, etc., et al., Defendants and Appellants.

## COUNSEL

Girard & Vinson, Christian M. Keiner, William F. Schuetz, Jr., and Scott K. Holbrook for Defendants and Appellants.

Miller Brown & Dannis, Nancy B. Bourne, Sue Ann Salmon Evans and Elizabeth Rho-Ng for Education Legal Alliance of the California School Boards Association as Amicus Curiae on behalf of Defendants and Appellants.

Merele D. Chapman for Plaintiffs and Respondents.

## OPINION

**WARD, J.**—Plaintiffs and respondents are five high school students in the Morongo Unified School District (the District).[1] They were members of the football team accused of sexual battery and other misconduct arising out of several locker room incidents. The District proposed to expel the students at a disciplinary hearing held before the District's governing board of trustees (the Trustees). The students, pursuant to Education Code section 48918, subdivision (i)(1), requested that certain witnesses be subpoenaed to attend the disciplinary hearing. The Trustees refused to issue the subpoenas.

---

[1]Six students were involved in the alleged misconduct. One of the six dismissed his petition for administrative mandate, without prejudice, in the proceedings below. That student, Blake Poist, is not a party to this appeal.

After the disciplinary hearings, the Trustees expelled the students. The students appealed to defendant San Bernardino County Board of Education (the County Board).[2] The County Board upheld the expulsions.

The students petitioned the San Bernardino County Superior Court for a writ of administrative mandate requiring the school board to issue the subpoenas. The trial court granted the writ. The court held that the issuance of subpoenas was mandatory under the statute.

Defendants and appellants, the individual Trustees, the District, the District superintendent of schools, and the principal and vice-principal of the students' high school, appeal the trial court's ruling. They argue that the trial court misinterpreted the statute and relevant legislative history. We shall reverse.

FACTS AND PROCEDURAL HISTORY

A. *Summary of the Alleged Incidents*

The charges against the six students involved several discrete events that took place in the football squad locker room.

The first incident took place in late August of 2000. Plaintiff and respondent Nathan Leatherman was alleged to have made another boy lick a stick of deodorant. Leatherman then stated that he had used the deodorant to "wipe his butt."

The second and third incidents took place on the afternoon of September 6, 2000. Plaintiffs and respondents Derrick Aguilar and Glenn Briggs, and possibly others, forced another boy (referred to in the proceedings as Student A) to the ground and held him down. Plaintiff and respondent Steven Hill then slapped Student A in the face with his penis. Minutes later, Leatherman, Aguilar, and Hill, together with plaintiffs and respondents Blake Poist[3] and Korey Woodbury, wrestled yet another boy (Student F) to the floor. Poist had a wooden dildo; after a struggle, the aggressors managed to pull down Student F's pants and insert the wooden dildo into his anus.

The final incident took place in mid-October of 2000. Leatherman allegedly made Student F march around the locker room with the wooden dildo in his mouth. Leatherman also manipulated the wooden dildo in Student F's

---

[2] The County Board was not named as an appellant in the notices of appeal filed in the superior court.

[3] Strictly speaking plaintiff Poist is not a respondent. See footnote 1, *ante.*

mouth, simulating oral copulation. When Leatherman saw another boy watching him, Leatherman put a real chicken's foot in that boy's mouth, and made both victims march around the locker room.

## B. *Disciplinary Proceedings*

The District informed the students and their parents that the principal had recommended their expulsion. The expulsion hearing before the Trustees was set for December 12, 2000. The students engaged Dr. Mark Lopez, director of a student rights advocacy center, as their representative.

On behalf of the students, Dr. Lopez wrote a letter to the Trustees, requesting that all six hearings be held at the same time, and that the hearings be open to the public. Dr. Lopez further requested that the Trustees "issue subpoenas for the purpose of requiring attendance . . . of witnesses who have evidence that is relevant to this alleged discipline matter." Dr. Lopez indicated that the students believed that witnesses against them had been intimidated into making false accusations.

The Trustees responded, agreeing to hold all the hearings simultaneously and to have the hearings open to the public. The Trustees gave notice of the scheduled time and place of the hearings. The Trustees further stated that, "[w]hile Education Code section 48918 does authorize governing boards to issue subpoenas for expulsion hearings, it does not require such action. The [Trustees] ha[ve] never issued subpoenas in the past and decline[] to do so in these pending matters."

On December 6, 2000, Dr. Lopez wrote to the Trustees asking that numerous persons be present to testify at the hearings. Dr. Lopez adverted to his earlier, denied, request for subpoenas, and took the position that the Trustees should "accept[] responsibility of insuring the production of all witnesses that the students deem necessary in the presentation of the students' case." The witnesses for whom Dr. Lopez requested subpoenas included the District superintendent, the assistant superintendent for educational services, the principal and vice-principals of Yucca Valley High School, the school's athletic director and 10 football coaches, the school's "campus supervisors," and a classroom aide. Dr. Lopez did not indicate the nature of testimony expected of these witnesses, except his reiterated allegations that District agents or employees somehow coerced witnesses into giving false statements, or intimidated other witnesses from coming forward, or suppressed their statements. In addition to the specifically named witnesses, Dr. Lopez stated that the students intended to call "approximately 20-25 Yucca Valley HS students." Dr. Lopez declined to name the proposed

student witnesses, allegedly "because they fear that the . . . administrators will threaten, harass or intimidate them prior to the hearing while they are attending school."

The Trustees replied on December 8, 2000, indicating that a number of the football coaches were not District employees, but had served temporarily during the football season as "walk-on coaches." The Trustees reported that "[a]ll other employees in your request have been notified of your request for their voluntary appearance."

The administrative record contains one exemplar of the "notification" of request for voluntary appearance issued by the District to its employees. It stated: "Please be advised that [the students] ha[ve] requested that the following witnesses be present and give testimony at the expulsion hearing now scheduled [giving the date, time, and location, but not naming any witnesses]. [¶] The Board of Education has not issued a subpoena for the attendance of any witnesses in this matter. Therefore, neither the district nor the students can compel attendance at this hearing. In all likelihood, Mr. Lopez will be presenting his case after the end of your duty day. Your attendance in response to this request is purely voluntary on your part."

Dr. Lopez issued a supplemental witness list on December 12, 2000, the date the hearings were scheduled to begin, naming the Trustees' president, and the District's employee in charge of attendance and expulsion as witnesses. As before, Dr. Lopez referred to his earlier request for subpoenas, repeated his allegations of intimidation and coercion, and demanded that, if the Trustees did not issue subpoenas, they assume responsibility for producing the students' requested witnesses at the hearings.

The hearings commenced as scheduled on December 12, 2000. Dr. Lopez again raised the issue of subpoenas, making an "offer of proof" that the individual Trustees he had sought to subpoena would be examined concerning their role in the decision not to issue subpoenas.

In the balance of the hearings on that date, two of the victims testified in closed session. The hearings resumed on December 13, 2000, with evidence from the vice-principal who had conducted an initial investigation into the alleged incidents. The hearings were not able to be concluded on that date. The Trustees recessed the hearings to December 19, 2000. Dr. Lopez, insisting that the students had a statutory right to a continuous hearing, objected to the December 19 date. The Trustees overruled the objection, and ordered the hearings to resume on December 19.

The transcript indicates that the hearings were marred by something of a circus atmosphere, with outbursts from the parents and others who were

present, including direct appeals by Dr. Lopez to the audience. A great deal of time in the initial two days of the hearings was taken up with wrangling over collateral issues and arguments. At the resumption of the hearings on December 19, therefore, the Trustees had certain remarks added to the record, appealing to those present to respect proper decorum and to allow the hearings to proceed in an orderly manner. The District's counsel and Dr. Lopez were admonished to focus their presentations upon factual matters concerning the occurrence or nonoccurrence of the events upon which the allegations were based. The advocates were further instructed not to approach witnesses or the board members, to speak only from the podium provided, to remain seated when not at the podium, to refrain from addressing the audience directly or from making gestures to the audience, to refrain from improper or argumentative questions, and to refrain from arguing with the board members or their advisor. In addition, the audience was cautioned to refrain from making displays (e.g., cheering or clapping). The Trustees indicated that, if the procedural guidelines were not observed, the hearings would be recessed and conducted in the absence of anyone except legitimate participants.

The Trustees' legal adviser called upon Dr. Lopez to resume his cross-examination of the vice-principal. Dr. Lopez continued his obstructionist tactics, however, challenging the adviser: "I'm not going to stand at the podium. So are you going to arrest me? That's the big question, isn't it, Mr. Patterson [the Trustees' legal adviser]?

"MR. PATTERSON: If you're not going to comply, Dr. Lopez, the decision is in your hands, because we'll recess right now.

"DR. LOPEZ: Mr. Patterson, you can recess all you want to. . . .

"MR. PATTERSON: Are you going to comply with the procedures or not?

"DR. LOPEZ: First I have to ask and I asked before, are you making that under the Brown Act?

"MR. PATTERSON: Are you going to comply with the procedures or not?

"DR. LOPEZ: I asked a question, Mr. Patterson. You're the hearing advisor."

The Trustees, having given Dr. Lopez several opportunities to behave civilly, immediately recessed the hearings to the following day, "with only the students, their parents, attorney, advocate, and press present."

On December 20, 2000, the hearings resumed at 9:00 a.m. The Trustees' legal adviser invited Dr. Lopez to resume his cross-examination. Instead, Dr. Lopez stated, "pursuant to Education Code section 48918(a), the students will ask for a 30-day postponement," and apparently presented a document making such a written demand. Without waiting for a reply, he told his clients, "Let's go"; Dr. Lopez, the accused students and their families apparently then left the hearing room *en masse*. The Trustees denied the request for a postponement and directed an officer in attendance to inform Dr. Lopez and the students, who were apparently outside the hearing venue, that the hearings would be immediately resumed. Dr. Lopez reportedly said, "They can do what they want," and departed.

The hearings then resumed with documentary and testimonial evidence. Ultimately the Trustees voted to expel all six students.

The students appealed their expulsions to the County Board. The County Board affirmed all six expulsions.

C. *Writ Proceedings*

The students then filed a petition for writ of administrative mandate, alleging numerous errors in the disciplinary proceedings. The trial court ruled against the students as to each point raised, save one: the Trustees' refusal to issue subpoenas for the students' requested witnesses. Otherwise, the court would have affirmed the expulsions, with certain modifications not pertinent here. The trial court construed the relevant provisions of the Education Code to impose upon the Trustees a mandatory duty to issue the requested subpoenas; the refusal to do so deprived the students of due process and required either a new hearing, with the opportunity to subpoena witnesses, or expungement of the students' records.

The court's judgment denied the students' request for attorney fees and costs under Government Code section 800.[4] The students brought a new

---

[4]Government Code section 800 provides: "In any civil action to appeal or review the award, finding, or other determination of any administrative proceeding under this code or under any other provision of state law, except actions resulting from actions of the State Board of Control, where it is shown that the award, finding, or other determination of the proceeding was the result of arbitrary or capricious action or conduct by a public entity or an officer thereof in his or her official capacity, the complainant if he or she prevails in the civil action may collect reasonable attorney's fees, computed at one hundred dollars ($100) per hour, but not to exceed seven thousand five hundred dollars ($7,500), where he or she is personally

motion for attorney fees, however, before another judge on a private attorney general theory[5] and were awarded attorney fees.

### D. Present Appeal

The Trustees, individually and as a governing board, the District, and the high school principal and vice-principal (collectively defendants) appealed the judgment and the award of attorney fees. Defendants raise two points on appeal. First, they argue that the trial court misconstrued the pertinent statutory provisions. Defendants maintain that the relevant statute empowers school governing boards to issue subpoenas as a discretionary matter, and that issuing subpoenas is not mandatory upon request. Second, defendants argue the award of private attorney general attorney fees was improper.

### ANALYSIS

### I. The Subpoena Issue

### A. Standard of Review

The main thrust of the appeal turns on the proper interpretation of Education Code section 48918, subdivision (i)(1). Statutory construction is a question of law, which this court reviews de novo.[6]

### B. Education Code Section 48918

Education Code section 48918 provides, among other things, for an evidentiary hearing when the governing board proposes to expel a pupil. Provisions dealing with notice, the opportunity to appear at the hearing, the attendance of counsel or an advocate, preparation of findings and of an administrative record, are included. As pertinent here, Education Code section 48918 provides: "The governing board of each school district shall establish rules and regulations governing procedures for the expulsion of pupils. These procedures shall include, but are not necessarily limited to, all of the following: [¶] . . . [¶]

"(i)(1) Before the hearing has commenced, the governing board may issue subpoenas at the request of either the superintendent of schools or the

---

obligated to pay the fees, from the public entity, in addition to any other relief granted or other costs awarded.

"This section is ancillary only, and shall not be construed to create a new cause of action.

"Refusal by a public entity or officer thereof to admit liability pursuant to a contract of insurance shall not be considered arbitrary or capricious action or conduct within the meaning of this section."

[5]Code of Civil Procedure section 1021.5.

[6]*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212 [100 Cal.Rptr.2d 718].

superintendent's designee or the pupil, for the personal appearance of percipient witnesses at the hearing. After the hearing has commenced, the governing board or the hearing officer or administrative panel may, upon request of either the county superintendent of schools or the superintendent's designee or the pupil, issue subpoenas. All subpoenas shall be issued in accordance with Sections 1985, 1985.1, and 1985.2 of the Code of Civil Procedure. Enforcement of subpoenas shall be done in accordance with Section 11525 of the Government Code.

"(2) Any objection raised by the superintendent of schools or the superintendent's designee or the pupil to the issuance of subpoenas may be considered by the governing board in closed session, or in open session, if so requested by the pupil before the meeting. Any decision by the governing board in response to an objection to the issuance of subpoenas shall be final and binding.

"(3) If the governing board, hearing officer, or administrative panel determines, in accordance with subdivision (f), that a percipient witness would be subject to an unreasonable risk of harm by testifying at the hearing, a subpoena shall not be issued to compel the personal attendance of that witness at the hearing. However, that witness may be compelled to testify by means of a sworn declaration as provided for in subdivision (f)."

▆▆ The question is whether the provision that the Trustees "may" issue subpoenas is a grant of discretionary power, or whether the statute creates a mandatory duty to issue subpoenas on request.

### C. *The Trial Court's Interpretation of the Statute*

The trial court interpreted the word "may" in Education Code section 48918, subdivision (i)(1) simply as a term granting subpoena power. In other words, where there had previously been no subpoena power vested in school district governing boards, the Legislature extended a grant of such power to the board: "the Legislature is granting subpoena power to the board by saying that the board may issue subpoenas." The trial court accepted the students' argument that, *"in the context of a statute defining a public duty,* the word 'may' is *mandatory."*[7] Further, cases in which the administrative agency at issue did not have subpoena power suggested to the court that *"if an administrative agency does have subpoena power,* a party is *entitled* to use it as a matter of right. Otherwise, there would be no [reason that] the court would assume that the plaintiff 'would have enjoyed' that subpoena power if

---

[7]Citing *Mass v. Board of Education* (1964) 61 Cal.2d 612, 622-623 [39 Cal.Rptr. 739, 394 P.2d 579].

the board had possessed it."[8] The trial court below therefore viewed the statutory language, that a school district governing board "may" issue subpoenas, as mandatory: i.e., the board "is without discretion *not* to use [their subpoena powers] to issue subpoenas on the request of a party before it."

D. *Education Code Section 48918, Subdivision (i)(1) Vests School Boards with Discretionary Power to Issue Subpoenas in Expulsion Proceedings*

" 'Our role in construing a statute is to ascertain the Legislature's intent so as to effectuate the purpose of the law.' "[9] In so doing, "[w]e consider first the words of the statute because they are generally the most reliable indicator of legislative intent."[10] We " 'giv[e] to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. . . . The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' "[11] Rules of statutory construction are not to be rigidly applied in isolation, however. The touchstone is always the intent of the legislation. Thus, for example, the California Supreme Court has noted that "the rule against interpretations that make some parts of a statute surplusage is only a guide and will not be applied if it would defeat legislative intent or produce an absurd result."[12] Similarly, the "courts do not apply the *expressio unius est exclusio alterius* principle 'if its operation would contradict a discernible and contrary legislative intent.' [Citations.]"[13]

The correct construction of a statute is not divorced from its context. "To determine the purpose of legislation, a court may," therefore, properly

---

[8]Citing *Mohilef v. Janovici* (1996) 51 Cal.App.4th 267, 299, 304 [58 Cal.Rptr.2d 721], quoting *Wool v. Maryland-Nat. Capital Park & Plan. Com'n* (D.Md. 1987) 664 F.Supp. 225, 230-231 (" 'If the Board had possessed subpoena power, plaintiff would have enjoyed an additional avenue through which to present evidence in this case. But in light of the other means available to plaintiff, this Court is not convinced that the lack of subpoena power denied plaintiff the minimum procedural protections required by the Fourteenth Amendment.' ").

[9]*In re J.W.* (2002) 29 Cal.4th 200, 209 [126 Cal.Rptr.2d 897, 57 P.3d 363].

[10]*In re J.W., supra,* 29 Cal.4th 200, 209.

[11]*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1055 [48 Cal.Rptr.2d 1, 906 P.2d 1057], quoting *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].

[12]*In re J.W., supra,* 29 Cal.4th 200, 209.

[13]*In re J.W., supra,* 29 Cal.4th 200, 209.

"consult contemporary legislative committee analyses of that legislation, which are subject to judicial notice."[14]

### 1. *The Words Do Not Evince an Intent to Create a Mandatory Duty to Issue Subpoenas*

We look first to the words of the statute themselves. Education Code section 48918, subdivision (i)(1) states that the governing board *"may* issue subpoenas." (Italics added.) Ordinarily, the word "may" connotes a discretionary or permissive act; the word "shall" connotes a mandatory or directory duty.[15] This distinction is particularly acute when both words are used in the same statute.[16]

Education Code section 48918, subdivision (i)(2) provides that the governing board may rule upon any objections to the issuance of subpoenas, and that the governing board's decision regarding any such objection "shall be final and binding." Education Code section 48918, subdivision (i)(2) thus assumes that the issuance of subpoenas is subject to some kind of evaluation by the governing board, and that the results of the governing board's evaluation lay the issue to rest.

Where the statutory language is clear and unambiguous, there is no need for judicial construction.[17] Giving the words used here their ordinary import and meaning, we discern no particular ambiguity. The Legislature is presumably aware of the ordinary meaning assigned to the words "may" and "shall," and has used the word "shall" almost exclusively in enacting Education Code section 48918. The word "may" has been reserved for use only in stating that "the governing board *may* contract with the county hearing officer"[18] to conduct an expulsion hearing, rather than conducting the hearing itself, and that the governing board *"may* issue subpoenas."

Based solely on the language of the statute, we would conclude that Education Code section 48918, subdivision (i)(1) prescribes a permissive, rather than a mandatory, act.

The matter is not wholly free from all doubt, however; assuming that the provision is ambiguous, we may look to other aids in interpreting its

---

[14]*In re J.W., supra,* 29 Cal.4th 200, 211.

[15]*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1144-1145 [43 Cal.Rptr.2d 693, 899 P.2d 79].

[16]*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 [261 Cal.Rptr. 574, 777 P.2d 610]; *Maryland Casualty Co. v. Andreini & Co.* (2000) 81 Cal.App.4th 1413, 1420 [97 Cal.Rptr.2d 752].

[17]*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519 [106 Cal.Rptr.2d 548, 22 P.3d 324]; *Praiser v. Biggs Unified School Dist.* (2001) 87 Cal.App.4th 398, 401 [104 Cal.Rptr.2d 551].

[18]Education Code section 48918, subdivision (d), italics added.

meaning: If the statutory language is ambiguous, we may look to the legislative history, the background of the enactment, including apparent goals of the legislation, and public policy, to determine its meaning.[19] We turn to these matters next.

### 2. The Legislative History and the Purpose of the Legislation Indicate an Intent to Make Issuance of Subpoenas a Matter of Discretion

The history of the enacting legislation demonstrates that, contrary to the students' thesis, Education Code section 48918, subdivision (i)(1) was intended to grant a discretionary authority, not to impose a mandatory duty. Education Code section 48918, subdivision (i) began life as Assembly Bill No. 618 (Assembly Bill 618), introduced by Assembly Member William Morrow. In its original form, Assembly Bill 618 proposed to add a new subdivision to Education Code section 48918, as follows: "(i)(1) Before the hearing has commenced, the governing board *shall* issue subpoenas and subpoenas duces tecum at the request of either the county superintendent of schools or his or her designee or the pupil, for the attendance of witnesses or the production of documents at the hearing. After the hearing has commenced, the governing board of the hearing officer or administrative panel may, upon request of either the county superintendent of schools or his or her designee or the pupil, issue subpoenas and subpoenas duces tecum. . . ." (Italics added.)

The Legislative Counsel's Digest of the introduced bill explained: "Existing law requires the governing board of each school district to establish rules and regulations governing procedures for the expulsion of pupils, including a procedure that provides a pupil with a hearing to determine whether the pupil should be expelled. . . .

"This bill would *require*, before a hearing on an expulsion has been commenced, the governing board of the school district to issues subpoenas and subpoenas duces tecum for the attendance of witnesses or the production of documents at the request of the county superintendent of schools . . . or of the pupil. The bill would *authorize*, after the hearing on an expulsion has commenced, the governing board or the hearing officer or administrative panel to issue subpoenas or subpoenas duces tecum at the request of the county superintendent of schools . . . or of the pupil. . . .

---

[19] *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 129 [96 Cal.Rptr.2d 485, 999 P.2d 718]; *Case v. Lazben Financial Co.* (2002) 99 Cal.App.4th 172, 186 [121 Cal.Rptr.2d 405].

*"Because the bill would place a new duty on the governing boards of school districts, it would constitute a state-mandated local program."* (Legis. Counsel's Dig., Assem. Bill No. 618 (1995-1996 Reg. Sess.), as introduced, italics added.)

The impetus for the bill apparently was the concern expressed by one school superintendent that the power to compel witnesses to attend expulsion hearings was necessary when witnesses were reluctant to testify.

An exchange of views among legislators and interested school groups resulted in modifications to the proposed bill. Among other things, some school officials believed that granting the subpoena power would make expulsion hearings more like civil or criminal courtroom trials: more cumbersome, more formal, more contentious, more protracted and more expensive. Some feared that making issuance of subpoenas mandatory would lead to abuses by pupils, and would clog hearings with numerous "character" and other collateral witnesses. Further, school board members are often not trained in the law, and would have difficulties ruling on objections to subpoenas, or in distinguishing legitimate from illegitimate uses of the subpoena power. Changes were suggested to address these problems.

The bill as amended read (with deletion indicated in strikeout type and additions in italics):

"(i)(1) Before the hearing has commenced, the governing board ~~shall~~ *may* issue subpoenas ~~and subpoenas duces tecum~~ at the request of either the ~~county~~ superintendent of schools or ~~his or her~~ *the superintendent's* designee or the pupil, for the ~~attendance of~~ *personal appearance of percipient* witnesses ~~or the production of documents~~ at the hearing. After the hearing has commenced, the governing board or the hearing officer or administrative panel may, upon request of either the county superintendent of schools or ~~his or her~~ *the superintendent's* designee or the pupil, issue subpoenas ~~and subpoenas duces tecum~~. . . ."

The Legislative Counsel's Digest of the amended bill reflected the changes (alterations indicated as before): "This bill would ~~require~~ *authorize,* before a hearing on an expulsion has been commenced, the governing board of the school district to issue subpoenas ~~and subpoenas duces tecum~~ for the ~~attendance of~~ *personal appearance of percipient* witnesses ~~or the production of documents~~ at the request of the ~~county~~ superintendent of schools or ~~his or her~~ *the superintendent's* designee or of the pupil. . . .

"~~Because the bill would place a new duty on the governing board of school districts, it would constitute a state-mandated local program.~~"

The amended language of the bill was retained in the final enactment of Education Code section 48918, subdivision (i).

In our view, the alterations demonstrate with reasonable certainty that, although the bill as originally proposed would have created a mandatory duty to issue subpoenas before the hearing had commenced, and discretionary power to issue subpoenas once the hearing had begun, the bill as amended provided only for discretionary issuance of subpoenas, whether before or after the hearing had begun.

■ Revisions to a bill may properly be considered in construing the resulting statutory language.[20] ■ Here, the Legislature specifically rejected the word "shall" in the enactment, replacing it with the word "may." Further, the Legislative Counsel's Digest initially reported that school boards would be "required" to issue subpoenas upon request, but amended the description of the bill simply to "authorize" school boards to issue subpoenas—a sensible description of a grant of power where there had been none before. The bill as introduced was originally described as imposing a "new duty" on school boards, thus creating a state-mandated local program. The description of the amended bill deleted any reference to imposing a duty upon local school boards. (The bill as amended was ultimately evaluated as creating a state-mandated local program, however, but only insofar as enforcement of subpoenas in the superior court could result in reluctant witnesses being found guilty of a criminal contempt.)

■ We must construe an enactment to effectuate, and not to frustrate, the purpose of the law.[21] ■ The purpose of the legislation also militates in favor of construing the statute as granting an exercise of discretion, rather than creating a mandatory public duty to issue subpoenas. The legislative committee reports described the purpose as, "to make expulsion hearings more effective." That is, the proponents argued, "the subpoena power will increase the effectiveness of expulsion hearings by ensuring that vital witnesses (i.e., *those who perceived the conduct*) will participate. Currently, many witnesses do not appear at hearings." (Italics added.)

---

[20] See *People ex rel. Mautner v. Quattrone* (1989) 211 Cal.App.3d 1389, 1396 [260 Cal.Rptr. 44].

[21] *Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977 [90 Cal.Rptr.2d 260, 987 P.2d 727]; *DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387 [20 Cal.Rptr.2d 523, 853 P.2d 978].

It thus appears that the amendments to Assembly Bill 618, restricting the issuance of subpoenas to "percipient witnesses" were intended to curb potential abuses by, e.g., subpoenaing numerous "character" witnesses, or witnesses who did not perceive the alleged misconduct, but whose evidence relates to collateral issues only.

Our interpretation fully accords with the maxim that statutes should be construed so as to avoid absurd results.[22]

Construing Education Code section 48918, subdivision (i) to require mandatory issuance of subpoenas upon request would foreseeably embroil school boards in protracted prehearing proceedings solely concerning contested rulings on the issuance of subpoenas. As correspondence during the pendency of Assembly Bill 618 indicated, school board members are often volunteer citizens, untrained in the intricacies of evidence and legal procedures. Further, setting the prehearing subpoena proceedings and objections to one side, making expulsion hearings into full-blown trials, with the compelled attendance of many witnesses, will do little to enhance effectiveness of expulsion hearings. The purpose of the legislation is manifestly to provide school boards with a tool to be used when it is of benefit, rather than to create a mandatory duty to issue subpoenas upon demand.

We note in passing that there is no necessity that the power to issue subpoenas be mandatory, or even that such a power exist all, to satisfy due process requirements. " 'It is entirely possible that an agency without subpoena powers could secure the voluntary appearance of witnesses whose testimony would be sufficient to establish a substantial case. . . .' [Citation.]"[23] The mere provision of a subpoena power does not, therefore, in itself require that the power be mandatory rather than discretionary. Here, the context and background compel the conclusion that the power granted was intended to be discretionary.

E. *Discretion to Issue Subpoenas Must Not Be Exercised Arbitrarily*

 "Hundreds of laws and regulations are subject to interpretation and application by state and local agencies designated to administer them; in so

---

[22]*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 142 [65 Cal.Rptr.2d 580, 939 P.2d 1280]; *County of Los Angeles v. Smith* (1999) 74 Cal.App.4th 500, 505 [88 Cal.Rptr.2d 159].

[23]*Townsel v. San Diego Metropolitan Transit Development Bd.* (1998) 65 Cal.App.4th 940, 951 [77 Cal.Rptr.2d 231].

doing, the exercise of discretion is common. And the courts routinely review these decisions for 'abuse of discretion.' "[24] An administrative agency may abuse its discretion if it acts arbitrarily or capriciously. ■ More pertinently here, "[a] refusal to exercise discretion is itself an abuse of discretion."[25] Thus, "although mandamus is not available to compel the exercise of the discretion in a particular manner or to reach a particular result, it does lie to command the exercise of discretion—to compel some action upon the subject involved under a proper interpretation of the applicable law."[26]

■ Here, the Trustees apparently adopted a blanket policy never to issue subpoenas. In so doing, the Trustees in essence abdicated their discretion, rather than exercising it. This, they may not do. Nonetheless, by analogy to the mandate of the California Constitution, article VI, section 13, we discern no miscarriage of justice which has resulted from the Trustees' procedural error in refusing to issue subpoenas in this case.

F. *No Abuse of Discretion Resulted from the Refusal to Issue Subpoenas in This Case*

■ The students named many witnesses—individual Trustees, other administrators, numerous football coaches, and other school personnel—and claimed they were "percipient" witnesses to the events at issue. They backed up these claims, however, with nothing other than bald assertion. The only witness as to whom Dr. Lopez made an offer of proof was one of the Trustees, not to give evidence regarding the incidents for which the students were to be expelled, but to explain the Trustees' decisionmaking process in refusing the subpoenas. There was not the slightest indication that any of the named witnesses for whom subpoenas were sought had any relevant information to impart. Dr. Lopez's entire conduct of the proceedings on the students' behalf exposed his manifest purposes: delay, obstruction, obfuscation, disruption, harassment—in short, anything other than an attempt to determine the factual truth of the charges against the accused students. The matter has proceeded all the way through this appeal without identifying a single relevant purpose for the attendance of any of the requested witnesses.

We also find it significant that the students and their representatives walked out of the hearing. They never availed themselves even of the due

[24]*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1077 [123 Cal.Rptr.2d 278].
[25]*Morris v. Harper* (2001) 94 Cal.App.4th 52, 62-63 [114 Cal.Rptr.2d 62].
[26]*Morris v. Harper, supra,* 94 Cal.App.4th 52, 63.

process rights they were afforded; manifestly, Dr. Lopez's purpose was to thwart the proceedings and attempt to create "built-in" error. The Trustees were not required to kowtow to such belligerent truculence; thus we could not find any abuse of discretion under these facts in failing to issue the demanded subpoenas.

### G. *Reversal of the Judgment Granting the Writ Is Required*

The students sought writ review of the administrative proceedings below, asserting numerous grounds of error. The trial court reviewed each contention with great care. Aside from the subpoena issue, the court would have affirmed the expulsions, with some slight modifications to the findings, in each case. The writ was granted solely on the ground that the Trustees had a mandatory duty to issue the requested subpoenas, and the refusal to do so deprived the students of due process in the expulsion hearings. The students have not appealed the judgment, and thus have not challenged the trial court's rulings as to any of their other grounds for the petition. We have interpreted the statute differently from the trial court, however, to grant a discretionary authority to issue subpoenas, rather than to create a mandatory duty to do so.

Accordingly, the judgment granting the writ must be reversed. The trial court is directed to issue a new judgment denying the writ.

### II. *The Attorney Fees Issue*

The students first requested attorney fees of the trial court as prevailing parties, under Government Code section 800. The court denied the motion for fees. The students renewed their request on a new theory, the private attorney general theory, before a different judge. The new judge granted private attorney general fees under Code of Civil Procedure section 1021.5. Defendants appealed this order.

Private attorney general fees are available under Code of Civil Procedure section 1021.5 only to a "successful" party. Inasmuch as we have reversed the judgment as to the sole issue upon which the students prevailed, they cannot be considered successful parties. The award of attorney fees under Code of Civil Procedure section 1021.5 must therefore be reversed also.

### DISPOSITION

For the reasons stated, the judgment must be reversed, insofar as the trial court granted the writ on the ground of due process violation for refusal to

issue subpoenas to the students' proposed witnesses. No other ruling concerning the merits of the writ was appealed. The trial court is therefore directed to enter a new judgment denying the writ.

The order granting the students' attorney fees must also be reversed.

Defendants and appellants to recover costs on appeal.

Ramirez, P. J., and King, J., concurred.